IN THE UNITED STATES DISTRICT COURT
FOR EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

**FILED**

JAN 2 4 2020

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
CAPE GIRARDEAU

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
"BRITTANY WHITENER", UNDER
FACEBOOK USER ID NAME
https://www.facebook.com/brittany.westbrook2
THAT IS STORED AT PREMISES
CONTROLLED BY FACEBOOK INC.

Case No. _____

**Filed Under Seal**

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Jay Holcomb, Task Force Officer (TFO) of the Drug Enforcement Administration

being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for

information associated with a certain Facebook user ID Name

https://www.facebook.com/brittany.westbrook2 that is stored at premises owned, maintained,

controlled, or operated by Facebook Inc. ("Facebook"), a social networking company

headquartered in Menlo Park, California.  The information to be searched is described in the

following paragraphs and in Attachment A.  This affidavit is made in support of an application

for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require

Facebook to disclose to the government records and other information in its possession,

pertaining to the subscriber or customer associated with the user ID.

2.     I am an investigative or law enforcement officer of the United States, within the

meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to

conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

3.     I am a Master Sergeant with the Missouri State Highway Patrol.  I have 26 years of law enforcement experience with the Missouri State Highway Patrol and have been assigned to the Division of Drug and Crime Control for twenty one (21) years.  During my career as a police officer, I have attended numerous classes dealing with conducting narcotics investigations, and I have participated in numerous investigations which involved subjects bringing methamphetamine and other illegal drugs from the southwestern border area of the United States into Southeast Missouri. As such, I have become familiar with the various methods that drug traffickers use to transport illegal drugs to drug dealers for distribution at the street level.

4.     Since being assigned to the Missouri State Highway Patrol, Division of Drug and Crime Control in May 1998, I have participated in numerous complex investigations of drug-trafficking organizations dealing in cocaine, marijuana, heroin, methamphetamine, and other controlled substances.  I am familiar with numerous methods of investigation, including but not limited to, visual surveillance, questioning of witnesses, search and arrest warrants, pen registers, precision location information, confidential source and undercover agent debriefings, and court-authorized wire/electronic interception.  My specialized training has included, but is not limited to, investigation of the manufacture, possession, and distribution of controlled substances listed within the Controlled Substance Act, executing search and arrest warrants involving drug offenses, gathering drug and non-drug evidence, undercover assignments, supervision and utilization of informants, identification of clandestine laboratories, smuggling

methods, and money laundering tactics. I have furthermore received specialized training in conducting Conspiracy and Complex Investigations.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of various federal statutes, including; Conspiracy to Distribute Methamphetamine and Possess with Intent to Distribute Methamphetamine; the Unlawful Use of a Communication Facility to Facilitate Distribution of a Controlled Substance; and Continuing Criminal Enterprise, in violation of Title 21, United States Code, Sections 841(a)(1), 846, 843(b), and 848; Interstate Travel to Facilitate Narcotics Trafficking, in violation of Title 18, United States Code, Section 1952; and Money Laundering, in violation of Title 18, United States Code, Sections 1956 and 1957 are being committed by Brittany Whitener, and others known and unknown. There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## JURISDICTION

7.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

8.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## **PROBABLE CAUSE**

9.     On November 26, 2019, your affiant initiated an investigation based on information provided by the Bureau of Alcohol, Tobacco, and Firearms regarding individuals in the Southeast Missouri area distributing methamphetamine for members of the Grape Street Crips Street Gang based out of Los Angeles, California.  The Southeast Missouri individuals are a part of a nationwide distribution network.

10.     On August 13, 2018, Missouri State Highway Patrol Sergeant D.L. Crump conducted an interview of **Thomas A. WALLACE** who was currently under arrest for possession of methamphetamine, heroin, and other outstanding arrest warrants.  **WALLACE** agreed to cooperate with law enforcement and stated he could order a large amount of methamphetamine from **Brittany Nicole WHITENER**.

11.     **WALLACE** placed a consensually monitored telephone call to **WHITENER** and asked **WHITENER** for a price for six (6) ounces of methamphetamine for a friend. **WHITENER** quoted **WALLACE** a price of three thousand four hundred ($3,400.00) dollars.

12.     Members of the Missouri State Highway Patrol and Mineral Area Drug Task Force then traveled to the "Lock and Key" Salon, 15 West School Street, Bonne Terre, Missouri, which was owned by **WHITENER**.  A consent search of the business revealed five (5) ounces of methamphetamine and two (2) sets of digital scales. A consent search of **WHITENER'S** vehicle resulted in the seizure of an additional six (6) ounces of methamphetamine.

13.  **WHITENER** was advised of her rights per Miranda by Trooper Neil Jannin, and she indicated that she understood. **WHITENER** told Sergeant Ellsworth she had been distributing methamphetamine for several months since leaving her husband. **WHITENER** had met a male subject who would ride with her to the St. Louis area and purchase one-quarter (1/4) to one-half (1/2) pound of crystal methamphetamine during each trip. **WHITENER** stated she would provide the subject seven hundred ($700.00) dollars for each trip and would receive only one (1) ounce of methamphetamine in return. Sergeant Ellsworth questioned **WHITENER** why she was in possession of such a large quantity of methamphetamine if she only received one (1) ounce. **WHITENER** replied that the male subject had a key to her shop and had come by the night before and dropped off the methamphetamine for her to hold. **WHITENER** adamantly denied dealing in large quantities of methamphetamine and stated, "I only sell a little here and there. Just enough to get by."

14.  On August 14, 2018, **WHITENER** was charged with Delivery of Controlled Substance except 35 grams or less of Marijuana, in the Circuit Court of St. Francois County. **WHITENER** plead guilty on September 23, 2019, and was placed on five (5) years of supervised probation with a suspended imposition of sentence.

15.  On August 22, 2018, Mineral Area Drug Task Force (MADTF) Officer (TFO) D. W. Sansegraw executed a search warrant at the residence of **Sarah E. WOOD** in Farmington, Missouri.  During the execution of the search warrant, TFO Sansegraw seized methamphetamine, marijuana, and drug paraphernalia.

16.  **WOOD** was interviewed and indicated that she had been distributing methamphetamine for a few months and was going to quit. **WOOD** stated she had "maybe an ounce or less" inside her residence.  Sergeant Ellsworth asked **WOOD** who her source of supply

for the methamphetamine was. **WOOD** stated, "She is already locked up. You got her." Wood identified **WHITENER** as her source of supply for methamphetamine.

17. During the month of May 2019, a confidential informant (CI) provided information that **Brittany WHITENER** was distributing methamphetamine again. The CI indicated that **WHITENER** was having methamphetamine sent through the United States Postal Service to various addresses in the St. Francois County area.

18. On May 20, 2019, investigators working with United States Postal Inspector Matthew Murrow, were able to track a package being sent from California to a suspect address in St. Francois County. According to the CI, **WHITENER** orchestrated the shipment and was to ultimately be the recipient. A controlled delivery was attempted without success, as no one took possession of the parcel. A search warrant for the package was obtained and approximately four (4) pounds of methamphetamine was located inside.

19. In June 2019, Jefferson County, Missouri Sheriff's Detective Brian Wilson began receiving information from multiple sources of information that **WHITENER** was distributing pound quantities of methamphetamine in the Jefferson County, Missouri area.

20. On November 7, 2019, TFO Sansegraw conducted an interview of **Michael W. BARKS** at the Madison County Sheriff's Department in Fredericktown, Missouri. TFO Sansegraw requested consent to search **BARKS'** cellular telephone which he granted. TFO Sansegraw observed several messages between **BARKS** and **WHITENER** on Facebook Messenger which Sansegraw recognized as being related to narcotics transactions. (Note: For whatever reason, TFO Sansegraw did not record or otherwise preserve the message traffic at that time.)

21. **BARKS** told TFO Sansegraw that **WHITENER** was the "biggest

methamphetamine dealer in our area". **BARKS** stated **WHITENER** sells at least six (6) pounds of methamphetamine per week. **BARKS** identified **WHITENER** as his source of supply for methamphetamine.

22.  On November 27, 2019, I received information from ATF Special Agent Nellie Woodruff that according to Postal Inspector Dustin C. Holland, the residence at 317 West Main Street, Apartment A, Park Hills, Missouri had been receiving packages from addresses in the Los Angeles, California area.  Law enforcement intelligence sources identified this as the address for a **Brittany Nicole WHITENER.**

23.  A records search at the United States Postal Service was then conducted for mailing addresses connected to **WHITENER.**  The available records indicated that between July 2019 and the end of September 2019, a total of seven (7) packages had been delivered to 317 West Main Street, Apartment A, Park Hills, Missouri, from the State of California.  The packages ranged in weight from three (3) pounds, up to six (6) pounds, and all of the packages appeared to be suspicious in nature, due to bearing characteristics commonly seen on parcels associated with drug trafficking.

24.  On December 9, 2019, The Washington County Sheriff's Department received a call from a Ginger Vance, who had received two (2) United States Postal Service Parcels at her residence in Potosi, Missouri. Vance opened the boxes and discovered that they contained what she believed to be illegal drugs.

25.  Deputies responded and observed that both parcels had a return address of "**K. LAMONT**, 8456 Byrd Avenue, Inglewood, California". One (1) parcel was mailed on December 3, 2019 and the other parcel was mailed on December 6, 2019.  Both parcels were marked Priority Mail three (3) day shipping.  Both parcels were addressed to a "Ms. Lilly" at

Vance's address. The two parcels contained a total of approximately seven (7) pounds of methamphetamine.

26. Deputy Steven Rion conducted an interview of Vance's son, Tanner Katz. Tanner Katz stated that his brother, **Brody KATZ**, had been getting packages of methamphetamine in the mail. Tanner Katz knew of at least one other occasion when a package containing methamphetamine had arrived at the residence.

27. Tanner KATZ indicated that on that occasion, **Brody KATZ** had contacted Tanner Katz and told him to be on the lookout for a package arriving at the residence. **Brody KATZ** had advised his brother that when the package arrived to place it inside the residence and not to open it. Tanner Katz stated when the package arrived he did what **Brody KATZ** had instructed him to do and then took a nap. Tanner Katz stated that later when he awoke, he could hear **Brody KATZ** at the residence talking with someone downstairs. Tanner Katz walked downstairs and observed his brother, **Brody KATZ**, talking to a white female that **Brody KATZ** identified to him as the "Plug". I know from my training and experience that "plug" is a common street term for a narcotics supplier.

28. Tanner Katz stated **Brody KATZ** and the white female were cutting up what Tanner KATZ believed to be methamphetamine and separating it into plastic bags. I know from my training and experience that drug dealers routinely order larger amounts of drugs which are portioned out into smaller units of drugs that are commonly sold on the street.

29. Tanner Katz stated his brother, **Brody KATZ**, had contacted him today (December 9, 2019) and told him to be on the lookout for the two (2) packages. Tanner Katz further stated that the white female used to own a salon in St. Francis County, Missouri and was arrested for selling methamphetamine.

30.   Later on that same date, Deputy Rion provided a photo line to Tanner Katz in an attempt to identify the white female.  Tanner Katz identified Photo #4 as the white female "plug" that he observed packaging the methamphetamine with **Brody KATZ**.  Photo #4 is **Brittany Nicole WHITENER**.

31.   On December 10, 2019, Mineral Area Drug Task Force Officer Shannon Thompson conducted an interview with **Amber GARNER**.  **GARNER** was arrested after a vehicle pursuit and possession of methamphetamine in St. Francois County.   **GARNER** identified **WHITENER** as a main "source" of methamphetamine, in St. Francois County. **GARNER** explained **WHITENER** would receive pounds of methamphetamine through the mail. **GARNER** stated upon **WHITENER** receiving the packages she would then have individuals help sell the methamphetamine.  **GARNER** stated she was with **Dustin KINNARD** (her ex-husband) when **KINNARD** obtained the methamphetamine at **Brody KATZ** at **WHITENER'S** apartment earlier that day.   **GARNER** has obtained methamphetamine from **WHITENER** in the past.

32.   On Tuesday, December 10, 2019, Deputies Rion and B.A. Gillam spoke with Ginger Vance, whom they asked to contact her son **Brody KATZ** using Facebook Messenger. Because the connection was bad they ended up speaking on a land line.

33.   Vance asked if **KATZ** knew anyone that drove a white car.  **Brody KATZ** asked if it was an Elantra. (Note: your affiant is aware from the investigation that **WHITENER** drives a white in color Elantra automobile.)  Ginger Vance told **KATZ** that they drove to the driveway and then backed up to the mailbox.  Vance told **KATZ** she was on the front porch and stood there.  Vance said they went slow up the hill and then drove slowly back by.  Vance said the passenger had on a beanie cap.  Vance said a couple hours later a girl

showed up. Vance said the girl said her name was Lilly and that she tracked some packages that were delivered there. Ginger Vance told **KATZ** she told the girl the packages were at the police station.

34. On December 12, 2019, Jefferson County Detective Wilson made contact with a Confidential Source. According to the Confidential Source **Brett A. HOLDER** was selling a large amount of methamphetamine in the Hillsboro, Missouri area. The Confidential Source identified **HOLDER'S** source of supply of methamphetamine as **Brittany WHITENER, AKA "FLICKA".** According to the Confidential Source, **WHITENER** resides in the Park Hills, Missouri area and is known to be selling pounds of methamphetamine. The Confidential Source was told by **HOLDER** that **WHITENER** is receiving the methamphetamine through the mail and that her source of supply was from California. The Confidential source further advised that **WHITENER** was recently arrested for Trafficking Methamphetamine and subsequently posted bond with money provided to her by her methamphetamine supplier in California.

35. On December 16, 2019, Inspector Murrow provided your affiant an IP address of **47.154.55.24** that was utilized to track the United States Postal Packages containing methamphetamine that were seized at Vance's residence on December 9, 2019. The IP address of **47.154.55.24** was identified as belonging to Frontier Communications, 1800 41st Street, Suite N-100, Everette, Washington. On December 16, 2019, an administrative subpoena was issued to Frontier Communications for information of the account holder of IP address of **47.154.55.24**.

36. On December 17, 2019, I received the response from Frontier Communications that identified the IP address of **47.154.55.24** account holder as **Eric DELIRA** of 950 N.

Duesenberg Drive, Apartment 2306, Ontario, California.  It further revealed an email address

of ericdelira123@frontier.com.

37.     On December 17, 2019, Trooper Jannin applied for and received a State of

Missouri search warrant to place a Global Positioning Device (GPS) upon a white 2017

Hyundai Elantra passenger car, bearing Missouri registration **RB9M5R**.  This vehicle is

registered to and being operated by **Brittany N. WHITNER** of 317 West Main Street,

Apartment A, in Park Hills, Missouri. On December 20, 2019, Trooper Jannin was able to

attach the GPS device (GPS) upon the white Hyundai without **WHITENER'S** knowledge.

38.     On December 27, 2019, at approximately 4.49 pm, your affiant was contacted

by Trooper Jannin regarding the GPS device.  Trooper Jannin stated **WHITENER'S** vehicle

was currently at the Pear Tree Inn located at 103 Cape West Parkway in Cape Girardeau,

Missouri.  I immediately contacted Southeast Missouri Drug Task Force Officer (SEMO

DTF) Robert Newton who verified that the white 2017 Hyundai was parked at the Pear Tree

Inn.

39.     On December 29, 2019, at approximately 5:36 pm, your affiant was again

contacted by Trooper Jannin, who stated that **WHITENER'S** vehicle at that time located at

the Pear Tree Inn Cape Girardeau, Missouri.

40.     On December 30, 2019, your affiant and ATF TFO Eggers went to the Pear

Tree Inn located at 103 Cape West Parkway in Cape Girardeau, Missouri where we made

contact with General Manager Mark Glass.  Manager Glass allowed us to review the

surveillance camera footage of the front desk and hallway in an attempt to identify who

**WHITENER** was meeting with.  Investigators reviewed the hotel's security camera footage,

and observed that on December 27, 2019, at approximately 5:12 pm, **WHITENER** is seen

entering the front lobby of the Pear Tree Inn and going to the elevator. On December 29, 2019, at approximately 5:11 pm, **WHITENER** is observed entering the front lobby of the Pear Tree Inn and going to the elevator. TFO Eggers and I were unable to determine who **WHITENER** met with. From the circumstances, investigators believe that **WHITENER** was meeting with one or more persons for purposes of promoting illegal drug activity.

41.     On Monday, December 30, 2019, your affiant learned of a telephone number of **(314)-420-4443** that **WHITNER** had listed with the Missouri Department of Corrections, Division of Probation and Parole. An administrative subpoena was issued to AT&T for toll records from 11/30/19 -12/29/2019. On Tuesday, December 31, 2019, your affiant received the toll records for **(314)-420-4443**, which is used by **WHITNER**. **WHITENER** has approximately 5321 telephone calls from 11/30/2019 to 12/29/2019. I observed **WHITENER** has made approximately 271 telephone calls to **(310)-629-6969**, a number that was identified as belonging to a **Kevin Lamont NELSON** of 950 N. Duesenberg Drive in Ontario, California. Your affiant knows from training and experience that Ontario, California has been a "source city" for illegal narcotics for many years. **WHITENER** has also made approximately 371 telephone calls to **573-366-1104**, a number identified as being used by **Brody KATZ**.

42. On January 3, 2020, your affiant discovered that on November 18, 2019, telephone number **314-420-4443,** identified as belonging to **Brittany WHITENER,** was utilized to track a United States Postal Service package, weighing 1.25 pounds to 880 Buck Mountain Road, Doe Run, Missouri from California. This address belonged to **Whitney HARRINGTON** who has been identified as an associate of **WHITENER**. The IP address of **47.154.55.24,** associated with **DELIRA** also tracked the package. Inspector Murrow was further able to identify three

(3) separate packages, originating from California, mailed to the 880 Buck Mountain Road in August, October, and November of 2019.

43.     On January 6, 2020, your affiant conducted a computer check of **NELSON** through intelligence databases. The databases revealed that **NELSON** was convicted on 02-07-1990 in Los Angeles County California for Possession or Purchase of Cocaine Base for Sale.

44.     On January 3, 2020, your affiant further discovered that on December 3, 2019, a United States Postal Service Overnight Parcel was mailed from **WHITENER**'s address in in Park Hills, Missouri to **NELSON**'s address in Ontario, California. The IP address associated with **DELIRA, 47.154.55.24,** also tracked the package. Postal Inspector Murrow further discovered that two additional (2) Overnight Parcels have been mailed to **NELSON**'s address, one on October 26, 2019, from Park Hills, Missouri, and one on November 4, 2019 from Farmington, Missouri. Your affiant knows from training and experience, that people who are distributing illegal drugs which they obtained through the mail or other commercial carriers, will often send payment in cash to their suppliers to pay for the drugs. Those shipments of drug proceeds are often made using the mail, or commercial carriers like UPS or FedEx. Under the circumstances, investigators suspect that these parcels likely contained drug proceeds.

45.     On January 3, 2020, your affiant spoke with Inspector Murrow. I discovered that telephone **573-366-1104**, identified as a number utilized by **Brody KATZ**, was entered into the United States Postal Service System to track the two (2) parcels, containing the seven (7) pounds of methamphetamine, that were seized in Washington County, Missouri on December 9, 2019. Furthermore, the IP address associated with **DELIRA, 47.154.55.24** also

tracked the two (2) packages.

46.     On Monday, January 6, 2020, Missouri State Highway Patrol Trooper Timothy Craig applied for a search warrant with the St. Francis Missouri Circuit Court for a "ping" of **WHITENER'S** cellular telephone number of **314-420-4443.**  The search warrant was served on AT&T to initiate the pinging on January 6, 2020.

47.     On Monday January 6, 2020, Affiant was contacted by Inspector Murrow concerning a suspicious package in route from California to "Myeshia Jones", 3016 Themis Street, Apartment A, in Cape Girardeau, Missouri.  Inspector Murrow checked USPS records and learned that between June 2019 and January 2020, a total of 17 parcels had been sent from the Los Angeles, California area to 3016 Themis, Apt A, with this being the 18th parcel.  Postal records also showed that multiple parcels were also sent from the Los Angeles area to 3016 Themis, Apt C, Cape Girardeau, Missouri. Two of those parcels delivered in November 2019, included return addresses of "The Shirt Cannery, 25270 Marguerite Pkwy #E, Mission Viejo, CA 92692."  One of those parcels was addressed to "Teresa Jones" and the other to "Myeshia Jones".

48.     Inspector Murrow contacted The Shirt Cannery and spoke with the owner.  She advised they had not sent anything to Missouri and did not use the mail in the normal course of their business.  She stated her business had not mailed either of the parcels to 3016 Themis, Apt C.  Your affiant checked intelligence database to discover **Tyrone Alonzo JONES** resided at the residence located at 3016 Themis Street, Apartment A, in Cape Girardeau, Missouri.

49.     On Tuesday, January 7, 2020, the affiant, Missouri State Highway Patrol (MSHP) Sergeant (SGT) John A. Lacey, Trooper R. Schneid and K-9 "Sato" met with

Inspector Murrow at the United States Postal Service Office located at 475 Kell Farm Drive in Cape Girardeau, Missouri.  Murrow intercepted the suspect parcel addressed to "Myeshia Jones at 3016 Themis Street, #A, Cape Girardeau, Missouri.  The sender was listed as "Green Street T-Shirts" of 15930 Downey Avenue, Paramount, California.  Inspector Murrow observed that the Subject Parcel featured several characteristics which he recognized as being consistent with shipments related to drug trafficking, including being sent from a source area for the distribution of controlled substances, featuring a handwritten label, being mailed from a zip code different than the return address, and being addressed to a name not associated to the address.

50.     The parcel was presented to Trooper Schneid and his assigned canine "Sato", along with several similar boxes which had never been used or sent through the US Mail.  Trooper Schneid advised "Sato" indicated the odor of a controlled substance coming from the parcel and not the other boxes.  Trooper Schneid advised he and Sato are certified as a narcotics detector dog/handler team through the Missouri Police Canine Association.

51.     A federal search warrant was obtained, and on January 7, 2020, at approximately 12:15 pm, Murrow executed the search warrant upon the parcel at the DEA Office. Located inside the parcel was one (1) vacuum sealed bag containing approximately 808.9 grams of a substance containing methamphetamine.  Inspector Murrow removed all but approximately two (2) ounces of the methamphetamine and placed the balance into evidence.

52.     Due to the location of 3016 Themis Street, Apartment A, an attempted controlled delivery was not conducted due to the inability to maintain constant surveillance of the entrance to the apartment, which is inside the building.  Instead, investigators placed a Parcel Pickup Notice inside the mailbox for Apartment A in an attempt to get the intended

recipient to pick up the package at the United States Post Office located at 320 North Frederick Street in Cape Girardeau, Missouri, where a controlled delivery could be conducted.

53.     At approximately 2:55 pm, Surveillance officers observed a black male arrive at the apartment building in a silver 2008 Jeep Cherokee with Missouri registration XD2V5K and check the mailbox for Apartments A and C. The black male was positively identified as **Tyrone JONES** by Sgt. Templemire and Sgt. Lacey. After checking the mailbox, **Tyrone JONES** left in the area in the Jeep. A records check indicated that the Jeep is registered to **Beth JONES** at 3016 Themis Street, Apartment A, Cape Girardeau, Missouri.

54.     Surveillance was maintained on **Tyrone JONES** in the Jeep and it was observed arriving at 1224 Missouri Street in Cape Girardeau, Missouri. The utilities for 1224 Missouri Street, Cape Girardeau, Missouri were checked and are in **Beth JONES'** name.

55.     Inspector Murrow, DEA SA Chris Turner, and the affiant went to the United States Post Office located at 320 North Frederick Street in Cape Girardeau, Missouri in an attempt to conduct a controlled delivery of the parcel. Surveillance was provided by Missouri State Highway Patrol Sergeant M. McClendon, Trooper Tim Craig, Trooper Robert North, Southeast Missouri Drug Task Force Officers M. Alford, B. Newton, and Mineral Drug Task Force Officers D. Sansegraw and S. Thompson.

56.     At approximately 4:38 pm, your affiant terminated the operation. At approximately 5:00 pm, Murrow was notified by the U.S. Post Office at 320 North Frederick Street in Cape Girardeau, Missouri that an unknown white female had arrived at closing time requesting the parcel addressed to "Myeshia Jones". The unknown white female was advised

the parcel was not at the U.S. Post Office but still at the sorting facility and would arrive tomorrow morning. The white female provided a telephone number of **314-320-3459.**

57.     On January 8, 2020, at approximately 8:15 am, USPI Murrow, SA M. Cossou, and the affiant arrived at the U.S. Post Office at 320 North Frederick Street in Cape Girardeau, Missouri to attempt a controlled delivery. At 8:37 am, USPI Murrow placed a telephone call to **314-320-3459** and left a message that the parcel was at the postal facility.

58.     At approximately 11:15 am, Inspector Murrow, SA Cossou, and the affiant were notified of a white female at the front desk requesting a parcel addressed to "Myeshia Jones". Inspector Murrow made arrangements for the delivery of the parcel.

59.     SA Cossou and your affiant observed a white female walk out of the front door of the Post Office and walk across Frederick Street carrying the parcel. The white female was walking towards the driver's door of a silver Dodge Dart bearing Missouri registration VC0P3T. The affiant made contact with the white female and requested to speak with her about the parcel she had picked up. The white female, later identified as **Stacy JONES** of St. Louis, Missouri, told your affiant she was picking up the parcel for "Aleisha." **Stacy JONES** did not know "Aleisha" nor did she know her last name. **Stacy JONES** stated "Aleisha" was a friend of a friend and that she had never met "Aleisha". The affiant asked **Stacy JONES** if she had a telephone number for "Aleisha". **Stacy JONES** replied "no." The affiant asked **Stacy JONES** how she was supposed to deliver the package. **Stacy JONES** replied she was waiting for "Aleisha" to call her and then she was going to meet "Aleisha" somewhere.

60.     Your affiant arrested **Stacy JONES** for Possession of a Controlled Substance with the Intent to Distribute – Methamphetamine. Your affiant, as witnessed by SA Cossou, had advised **Stacy JONES** of her rights per Miranda which she verbally indicated that she

understood. **Stacy JONES** invoked her right to attorney and no additional questions were asked at that time. Inspector Murrow took custody of the parcel, which was placed into evidence.

61.     At approximately 12:30 pm, **Stacy JONES** was being booked and processed at the Cape Girardeau Police Department.  While **Stacy JONES** was being processed, the affiant presented **Stacy JONES** with his business card along with his telephone numbers.  The affiant advised **Stacy JONES** to talk to her attorney and have her attorney contact Assistant United States Attorney Timothy Willis who was handling the case.  Affiant also explained the possible penalty for the offense to **Stacy JONES**. **Stacy JONES** stated that she was willing to speak with investigators, but she wanted to talk to her husband Joseph Jones before doing so. The affiant was able to contact **Stacy JONES's** daughter to obtain a telephone number for Joseph Jones.

62.     At approximately 2:15 pm, TFO Robert Newton and your affiant spoke with **Stacy JONES** in the interview room located at the Cape Girardeau Police Department.  The affiant contacted Joseph Jones at **314-390-4820,** and explained to Joseph Jones the situation and allowed him to speak to **Stacy JONES**.  After the telephone call, the affiant asked **Stacy JONES** if she wanted to speak to an attorney or to your affiant and TFO Newton. **Stacy JONES** stated that she only knew one girl's name.

63.     Your affiant again advised **Stacy JONES** of her rights per Miranda using a DEA Form 13.  Your affiant asked **Stacy JONES** if she understood her rights which **Stacy JONES** replied yes.  The affiant asked **Stacy JONES** if she could read, and **Stacy JONES** replied "Yes".  The affiant provided **Stacy JONES** with a pen and asked her to initial each

right on the DEA Form 13 indicating she understood her rights. **Stacy JONES** signed the

waiver of rights form on the bottom which your affiant and TFO Newton witnessed.

64.     **Stacy JONES** identified **Brittany N. WHITENER** as the individual that

directed her to pick up the parcel containing methamphetamine. **Stacy JONES** stated she met

**WHITENER** through a friend of her husband's, **Justin BENNETT**, who had been

incarcerated with Joseph JONES at the end of the summer of 2019. **Stacy JONES** stated she

has used methamphetamine for most of her life. **Stacy JONES** stated she has used

methamphetamine with **WHITENER,** but never purchased methamphetamine from her.

(NOTE: Investigators would later learn that **Stacy JONES** had not been honest about never

purchasing methamphetamine from **WHITENER**.)

65.     **Stacy JONES** stated **WHITENER** arrived at her residence on Monday night

with a white female, who **Stacy JONES** identified as Candace Cosby from a photograph that

I provided to her. **WHITENER** told **Stacy JONES** that a package was arriving and asked

**Stacy JONES** if she wanted to pick it up.

66.     **Stacy JONES** stated she knew the package contained "dope" but she did not

know how much. Your affiant asked **Stacy JONES** what **WHITENER** was going to pay her

for picking up the package, and **Stacy JONES** stated she hoped she would get an ounce of

methamphetamine for picking the package up.

67.     The affiant asked **Stacy JONES** how she knew the tracking number for the

parcel at the U. S. Post Office. **Stacy JONES** replied that **WHITENER** had texted her the

tracking number to **Stacy JONES** cellular telephone number of **314-320-3459.** The affiant

asked **Stacy JONES** how she was supposed to deliver the package to **WHITENER**. **Stacy**

**JONES** stated that once she had received the package **Stacy JONES** would call **WHITENER** and arrange to meet her.

68 .    Your affiant requested consent from **Stacy JONES** to search her cellular telephone, and she stated that she would allow me to only look at **WHITENER'S** text message and nothing else.  Your affiant declined and told **Stacy JONES** he would seek a search warrant for the cellular telephone.  **Stacy JONES** declined to provide the security pin number to unlock the cellular telephone, and the interview was terminated.

69.    On Thursday, January 9, 2020, at approximately 10:46 pm, Affiant was notified by Trooper Tim Craig that **WHITENER** was at the Drury Inn and Suites located at 3303 Campster Drive in Cape Girardeau, Missouri.   This information was from a State of Missouri Search warrants for a Global Positioning Device (GPS) that had been placed on **WHITENER's** vehicle and ping for **WHITENER'S** cellular telephone number of **314-420-4443.**

70.    On January 10, 2020, at approximately 06:00 am, your affiant observed **WHITENER** was still at the Drury Inn and Suites in Cape Girardeau, Missouri.  Your affiant requested TFO Eggers to conduct surveillance until a surveillance team could be in place.

71.    At approximately 06:34 am, TFO Eggers locate **WHITENER'S** white Hyundai Elantra, bearing Missouri registration RB9M5R, parked directly behind the Outback Steakhouse Restaurant located at 101 Cape West Parkway in Cape Girardeau between the Drury Inn and Suites and the Pear Tree Inn. Given my training and experience, I believed the fact that the vehicle had been parked behind the restaurant, as opposed to at the hotel was suspicious, as it seemed that the driver had been trying to conceal the car. At approximately

08:15 am, the affiant, TFO Robert Newton, and TFO M. Alford initiated surveillance on the **WHITENER'S** vehicle.

72.     At approximately 9:21 am, your affiant observed a white female wearing a green colored hooded jacket exit the north entrance of the Pear Tree Inn and walk to **WHITENER'S** vehicle.  Your affiant observed the white female through binoculars and recognized her as **WHITENER**.  **WHITENER** entered the driver's side of the vehicle and moved the vehicle from the rear of the Outback Steakhouse to the north entrance of the Pear Tree Inn.  **WHITENER** exited the vehicle and entered the Pear Tree Inn.

73.     At approximately 10:17 am, **WHITENER** was observed walking out of the north entrance of the Pear Tree Inn and entering her vehicle.  **WHITENER** briefly stopped at two nearby stores, and then headed northbound on Interstate 55.  Surveillance teams followed **WHITENER** into the Farmington, Missouri area.

74.     At approximately 10:45 am, your affiant and TFO Eggers made contact with the Drury Hotels General Manager Mark Glass.  Glass assisted us with identifying the room in which **WHITNER** had spent the night as Room 222. A review of the hotel's security video allowed investigators to identify **Tyrone JONES** as the renter of the room.  **Tyrone JONES** paid for the room in cash and exited the front entrance of the Pear Tree Inn.  **Tyrone JONES** is observed several minutes later entering the rear of the Pear Tree Inn with **Brittany WHITENER**.  Given my training and experience, it is highly unusual for people to pay for hotel rooms in cash, and can be indicative of someone trying to hide their activities from others, such as in the case of an illicit affair, or some type of criminal transaction.

75.     On Friday, January 10, 2020, MADTF TFO D. Sansegraw interviewed **Michael BARKS** at the Madison County Sheriff's Department where he was currently

incarcerated.  During the interview, **BARKS** gave verbal consent to search his cellular

telephone to TFO Sansegraw.  During the consent search of **BARK'S** telephone, TFO

Sansegraw documented the following Facebook conversations between **Brittany**

**WHITENER** and **BARKS**:

On October 24, 2019 WHITENER was in contact with BARKS about an amount of

money.

> **WHITENER:**    "I need that 300 today" at 1048 hours.
>
> **BARKS:**    "Well darling what and where you want me to be."
>
> **WHITENER:**    "Lol idc long as I get it b4 6. I'm short think Stacey fucking me so
> I'm stressing."
>
> **BARKS:**    "Stop stressing I'll loan you whatever you need I'm gonna have to
> grind some I haven't sold shit because Lori fucking stepping all over my feet selling to
> every God damn body."
>
> **WHITENER:**    "Well she can give me money to then."
>
> October 25, 2019-
>
> **BARKS:**    "How are you doing this early Friday morning" at 0218 hours.
>
> **WHITENER:**    "Bout to pass out lol"
>
> **BARKS:**    "Me too lol. I need my rest tomorrow night I'm gonna pull a
>           double."
>
> **WHITENER:**    "Me too frfr lol I been lining shit out all day."
>
> **BARKS:**    "Me too I got me a money man who will probably buy most of
>      the    goods time night we will talk in person."
>
> **WHITENER:**    "Awesome. I'm glad to have you on my team."

**BARKS:**          "Glad to be don't let me down.

**BARKS:**           "Morning!!!!$$$$" at 0930 hours.

**WHITENER:**        "Morning. Dude said it says should be delivered by 4 the latest lol.

October 26, 2019

**WHITENER** sends **BARKS** a screen shot of her Facebook message between her and

Stacy at 1226 hours.  **BARKS** confirmed it was **Stacy JONES.**

**WHITENER:**       I'm not one to take a loss especially after I did you so good. I'll get

my money's worth.  Believe that,"

**JONES:**           Look I'm sorry some shit happened I will get it taken care of.

**WHITENER:**        "Man u had my money u told me u did and then u fucked me

harder than what u even realize."

**JONES:**        "I am sorry I don't even no what else to say I did have it then."

**WHITENER:**       "Then what happened? And how are you gonna make it up?"

October 27, 2019

**WHITENER** sends **BARKS** a message asking him his location.

**BARKS:**           "Hey. I am at country Mart gas station."

**WHITENER:**         "U can come here or u not wanting to? We smoking some fake

19p."

**WHITENER** calls **BARKS** on Facebook messenger at 1546 hours.

**BARKS** does not answer.

**WHITENER:**            "Got a few hits sold for ya."

**WHITENER** sends **BARKS** a video.

**BARK** asked **WHITENER** if she knows who was in the video.

**WHITENER**: "Radar Michael Welch. Idk know but Lori does."

**BARKS**: " Yes I know of him never fucked with him I was just saying I seen his face Shaun Parson ran with him I think."

**WHITENER**: "Shawn parson a snitch too."

October 30, 2019

**WHITENER** sends **BARKS** a screen shot of a Facebook messenger of a message between **John boy Henderson** and her. The screen shot reveals **Henderson** says, "I'll pay it all if he brings it now." **Henderson** then sends an image of seven hundred ($700.00) dollars.

November 6, 2019

**BARKS** attempts to call **WHITENER** on Facebook messenger at 0850am.

**WHITENER** did not answer.

**BARKS**: "Need to see you asap. Are you home. Almost to you passing H now."

**WHITENER** forwards Barks an picture of a pink Glock 43 9mm, and states," My new toy."

**BARKS**: "I had a teal one."

**WHITENER**: "Mines cooler lol. Shes on her way there she lost her phone can u meet her. Tim Tucker straight up just told me Amber works with Task Force."

**BARKS**: "Tim Tucker was mad her."

**WHITENER**: "Maybe idk but she also just got caught in a stolen vehicle found with a gun and got no gun charge and said she wasn't questioned on it. Weird."

At 2017 hours **BARKS** missed a Facebook messenger phone call from **WHITENER**.

| | |
|---|---|
| **WHITENER:** | "Mikey Parsons the snitch that got them." |
| **BARKS:** | "I am I jail task Force at my house right now baby. They are at my house." |
| **WHITENER:** | "Omg." |
| **BARKS:** | "Yes its bad. They have found nothing yet." |
| **WHITENER:** | "God I hope they don't. Did you deal with Mike Parsons?" |

76. The affiant believes these conversations between **BARKS** and **WHITENER** are concerning monies that are owed regarding the sales of methamphetamine and to warn each other of the activities of law enforcements investigation attempts.

77. On Sunday, January 12, 2020, Trooper Craig was contacted by a female subject regarding Facebook Messages, containing what she believed to be drug conversations, between her fifteen (15) year old son and **Brittany WHITENER** which she had discovered on her son's phone. The female subject provided the cellular telephone and signed a consent to search form for Trooper Craig to examine the cellular telephone.

78. Investigators examined the Facebook messages and based upon the content and context believed that they did involve discussions involving **WHITENER** which were relative to drug distribution. That these exchanges involve **WHITENER** is corroborated by the details. In an exchange on Facebook Messenger with "Brittany Whitener" which occurred on December 25, 2019, the juvenile asks **WHITENER** about her car.

> Juvenile: "That's what's up what kind did you get"
>
> **WHITENER**: "2017 elantra Already busted the damn headlight out..damn tree came out outta nowehere lol"
>
> Juvenile: "Damn that's fucked up ihh the feds took my car so I gotta get a new one"

**WHITENER**: "The feds?! Wth u been doing?"

Juvenile: "Got caught movin kilos of coke"

**WHITENER**: "Ima have to teach u how to move lol"

79.     Affiant is aware from official records and surveillance that **WHITENER** has a

white in color 2007 Hyundai Elantra automobile. Given the tone and circumstances, including

the use of "emojis" investigators believe that the participants were joking about the seizure of

the car and the juvenile subject selling kilos of cocaine.

80.     In an exchange on Facebook Messenger with "Brittany Whitener" which

occurred on December 28, 2019, the juvenile messages **WHITENER** as follows:

Juvenile: "Aye look later I am gonna need a zap"

**WHITENER**: "Zip? Thought u weren't moving and grooving being a good kid?"

Juvenile: "Ya and I ant moving big wait but still getting some money you feel"

**WHITENER**: "I hear ya. You'll have to wait til I get back from my trip tn"

81.     Given my training and experience, I recognize that "zip" is a common street

term for an ounce of illegal drugs. Investigators believe that in this exchange, the juvenile

istelling **WHITENER** that he will need an ounce of drugs to sell, and that **WHITENER** is

willing to sell the ounce, however must wait to do so until she returns from a trip.

82.     In an exchange on Facebook Messenger with "Brittany Whitener" which

occurred on December 30, 2019, **WHITENER** expresses concern about the juvenile's father

finding out about their drug activity.

**WHITENER**: "If I do this and ur dad finds out he will KILL me I'll meet w u tm morning"

Juvenile: "You good and I am grown fuck he think he is gonna countril my life and lght that's a bet"

**WHITENER**: "But its me . .its a lil different he would be mad at me for encouraging it I can get u coca cola too ... js"

Juvenile: "Okay that's a bet and I mean I am my own person idc what he thinks"

**WHITENER**: "I care what he thinks mista. So it's our secret"

83.     Later on December 30, 2019, in an exchange on Facebook Messenger with "Brittany Whitener" the juvenile tells **WHITENER** where he is at and discuss what investigators believe from the context to be a pending drug deal.

Juvenile: "At a friends"

**WHITENER**: "Ok.."

Juvenile: "And look you should front me the zip and I will have your money by Thursday"

**WHITENER**: "Thursday? That's a long time away for a front lil one"

Juvenile: "Naw that's shit will be gone before then I was just sayin a time it can be before then"

84.     Based upon training and experience, investigators believe that the juvenile is attempting to get **WHITENER** to "front", or provide on credit, an ounce of methamphetamine, which the juvenile will pay for on the following Thursday after he has sold it."

85.     On January 1, 2020, in an exchange on Facebook Messenger with "Brittany Whitener", **WHITENER** contacts the juvenile about a possible drug debt that is owed to **WHITENER**.

**WHITENER**: "Hey ur GPA owes me 700 if u can get that money from ur GPA then I'll give u 50"

Juvenile: "lght for sure"

**WHITENER**: "Thank you. Hes pissing me off ur dad suggested to have u do it"

Juvenile:      "Does he even have money And ya he hasn't texted me back"

**WHITENER**: "He should have money I have him 2 zips"

Juvenile:      "Nigga you would front him but not me I know I be paying back my plugs because if you run off after the moneys gone you ant gotta money and you got people in your head"

**WHITENER**: "Ur dad asked me to and he was suppose to call me a couple hours later and didn't I'll send fam after his ass if I have to And her that cash and I'll fromt u today"

Juvenile: "lght I am tryan get ahold of him right now I got you fr fr"

86.     Based upon training and experience and the context of the investigation, investigators believe that **WHITENER** is attempting to get the juvenile to collect a $700 drug debt owed by the juvenile's "GPA" (possibly "grandpa"?) in exchange for $50 of the money. The juvenile's employment of the commonly used drug terms "front" and "plugs", leads investigators to believe that this is in fact a discussion about a drug debt, as opposed to money owed for some legitimate purpose.

87.     On January 2, 2020, in another exchange on Facebook Messenger with "Brittany Whitener", **WHITENER** contacts the juvenile in an exchange which investigators believe corroborates that **WHITENER** is obtaining methamphetamine through the mails.

**WHITENER**:        "After that u can No I planned to pay for it"

Juvenile: "Aww thank you so much And did it come in the mail"

**WHITENER**: "No this was thru someone else Ur welcome Its in fredricktown I just gotta get there"

Juvenile: "Do you want me to go pick it up for you after school then come over so you ant gotta worry about getting caught because I ant give a fuck to go back to juvie"

**WHITENER**: "Omg child No lol I'll get it"

88.     Based upon the investigation to date, your affiant and the investigative team believes that **WHITENER** has used the Facebook Messenger application to communicate with her associates about their criminal activities, and that there is probable cause to believe that the records of her Facebook account as outlined below will contain evidence of the offenses under investigation, including; Conspiracy to Distribute Methamphetamine and Possess with Intent to Distribute Methamphetamine; the Unlawful Use of a Communication Facility to Facilitate Distribution of a Controlled Substance; and Continuing Criminal Enterprise, in violation of Title 21, United States Code, Sections 841(a)(1), 846, 843(b), and 848; Interstate Travel to Facilitate Narcotics Trafficking, in violation of Title 18, United States Code, Section 1952; and Money Laundering, in violation of Title 18, United States Code, Sections 1956 and 1957.

89.     On January 2, 2020, investigators viewed the publicly available material on **Brittany WHITENER's** Facebook page. Based upon the facts gathered in the investigation to date, your affiant and the investigative team identified **Brittany WHITENER's** Facebook page by identifying **WHITENER** from photographs posted on her Facebook age and identifying the username in the URL of https://www.facebook.com/brittany.westbrook2   **Brittany WHITENER** also uses the name of **Brittany WESTBROOK** from a review of her Missouri driver's license information.  Further, the Facebook page of https://www.facebook.com/brittany.westbrook2 is

the same page which **BARKS** and the juvenile subject used to communicate with **WHITENER**.

90.    Investigators are aware that Facebook, "is a social networking website and service where users can post comments, share photographs and links to news or other interesting content to the Web, play games, chat live, and stream live video. Shared content can be made publicly accessible, or it can be shared only among a select group of friend or family or a single person." (Definition from Lifewire February 2, 2018).  Facebook also allows for direct messaging, also known as instant messaging, on Facebook's Messenger feature (hereinafter referred to as Messenger).

Investigators know that users of Facebook will often download the application to their cellular device in order to have access to all of the features while they are not near dedicated internet signals such as Wi-Fi, tablets, or desktop computers. Investigators are also aware that narcotics traffickers often utilize Facebook in order to conduct narcotics trafficking activities.

Based upon the information related above, as well as my training and experience, and the combined experience of other investigators and law enforcement personnel, I believe that the Facebook account of **Brittany WHITENER** associated with the user ID Name https://www.facebook.com/brittany.westbrook2 will contain evidence of the contacts and messages between **BARKS** and **WHITENER** described above, as well as contacts and messages between **Brittany WHITENER** and others with whom she is involved in distributing illegal drugs, and evidence of drug proceeds and assets which were purchased using drug proceeds which may be subject to seizure.

Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish

accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

Facebook users can exchange private messages on Facebook with other users using Messenger.  Those messages are stored by Facebook unless deleted by the user.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger.  These chat communications are stored in the chat history for the account.

Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook,

including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity

can show how and when the account was accessed or used.  For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the

content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

Due to the integrity of the ongoing investigation, and concern that disclosure may jeopardize the safety of cooperating individuals, it is requested that the Court order Facebook and its agents and employees not to disclose or cause a disclosure of this Court's Order the for the information listed in the search warrant and attachments, or the existence of the investigation to **Brittany WHITENER**, or any person other than those of its agents and employees who require this information to accomplish the execution of the warrant.

## CONCLUSION

Based on the forgoing, I request that the Court issue the proposed search warrant.

This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court of the Eastern District of Missouri.

Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING

I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of

the investigation.   Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Jay R. Holcomb
Task Force Officer
Drug Enforcement Administration


Subscribed and sworn to before me on _____January 24_____, 2020


UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the following Facebook user accounts that are stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

Information relating to the Facebook account associated with Brittany Nicole Whitener, with user name: https://www.facebook.com/brittany.westbrook2

**ATTACHMENT B**

**Particular Things to be Seized**

I.      **Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody,

or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or

information that have been deleted but are still available to Facebook, or have been preserved

pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the

following information to the government for each user ID listed in Attachment A:

(a) All contact and personal identifying information, including full name, user

identification number, birth date, gender, contact e-mail addresses, Facebook

passwords, Facebook security questions and answers, physical address (including

city, state, and zip code), telephone numbers, screen names, websites, and other

personal identifiers, group identification number, a list of users currently

registered to the group, and Group Contact Info, including all contact information

for the creator and/or administrator of the group and a PDF of the current status of

the group profile page.

(b) All geo-location information by that user ID

(c) All activity Logs for the account and all other documents showing the user's posts

and other Facebook activities;

(d) All photos and videos uploaded by that user ID and all photos and videos

uploaded by any user that have that user tagged in them;

(e) All profile information; News Feed information; status updates; links to videos,

photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member; including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(f) All other records of communications and messages made or received by the user, including all private messages, chat history, Video calling history, and pending "Friend" requests;

(g) All "check ins" and other location information;

(h) All IP logs, including all records of the IP addresses that logged into the account;

(i) All past and present lists of friends created by the account;

(j) All records of Facebook searches performed by the account;

(k) All information about the user's access and use of Facebook Marketplace;

(I) The types of service utilized by the user;

(m) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(n) All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(o) All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of the offenses of Conspiracy to Distribute Methamphetamine and Possess with Intent to Distribute Methamphetamine; the Unlawful Use of a Communication Facility to Facilitate Distribution of a Controlled Substance; and Continuing Criminal Enterprise, in violation of Title 21, United States Code, Sections 841(a)(1), 846, 843(b), and 848; Interstate Travel to Facilitate Narcotics Trafficking, in violation of Title 18, United States Code, Section 1952; and Money Laundering, in violation of Title 18, United States Code, Sections 1956 and 1957, involving Brittany Nicole Whitener, and others, since October 1, 2019, up to and including the date of the execution of this warrant herein, and information pertaining to the following matters:

(a) Evidence relating to the acquisition, movement, storage, processing, packaging and distribution of methamphetamine and/or other controlled substances.

(b) Evidence related to any agreement to obtain, possess with intent to distribute, package for distribution, or distribution of methamphetamine and/or other controlled substances.

(c) Evidence relating to the acquisition, movement, storage, concealment, payment, or disposal of any proceeds from the sale of controlled substances.

(d) Evidence relating to the acquisition of, location of, or disposal of any tangible asset obtained as a result of the distribution of a controlled substance, including such items as bulk cash, bank accounts, stocks, bonds, certificates of deposit, motor vehicles, real estate, jewelry, electronics or other items of personal property.

(e) Evidence relating to the acquisition of, location of, or disposal of any tangible asset used or intended to be used for the purpose of facilitating the offenses of Distribution of a Controlled Substance and Conspiracy to Distribute a Controlled Substance.

(f) Evidence of items associated with the commission of the offenses of Distribution of a Controlled Substance and Conspiracy to Distribute a Controlled Substance.

(g) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crimes under investigation and to the Facebook account owner;

(h) Evidence indicating the Facebook account owner's state of mind as it relates to the crimes under investigation;

(i) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(j) The identity of the person(s) who communicated with the user ID about matters

relating to the crimes under investigation, including records that help reveal their whereabouts.

(k) Evidence of any code, cypher, application or device used by the conspirators in order to conceal or encode communications related to the commission of the offenses under investigation.